*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————

**UNITED STATES**
Appellee

**v.**

**Pedro M. BESS, Hospital Corpsman
Second Class Petty Officer**
United States Navy, Appellant

**No. 19-0086**
Crim. App. No. 201300311

Argued October 23, 2019—May 14, 2020

Military Judge: Heather Partridge

For Appellant: *Lieutenant Clifton E. Morgan III,* JAGC, USN (argued); *Lieutenant Commander William L. Geraty*, JAGC, USN, and *Lieutenant Commander Jacob E. Meusch*, JAGC, USN (on brief).

For Appellee: *Lieutenant Kurt W. Siegal*, JAGC, USN (argued); *Colonel Mark K. Jamison*, USMC, *Captain Brian L. Farrell*, USMC, and *Brian K. Keller*, Esq. (on brief); *Lieutenant Joshua C. Fiveson*, JAGC, USN.

Amicus Curiae for Appellant: *Daniel S. Harawa*, Esq., *Sherrilyn A. Ifill*, Esq., *Kerrel Murray*, Esq., *Janai S. Nelson,* Esq., and *Samuel Spital*, Esq., for the NAACP Legal Defense and Educational Fund, Inc. (on brief).

Judge RYAN delivered the opinion of the Court, in which Chief Judge STUCKY joined, and Judge MAGGS joined, except as to Part II.B.1. Judge MAGGS filed a separate opinion, concurring in part and concurring in the judgment. Judge OHLSON filed a dissenting opinion, in which Judge SPARKS joined. Judge SPARKS filed a dissenting opinion, in which Judge OHLSON joined.

———————

Judge RYAN delivered the opinion of the Court.

Appellant's original conviction was set aside for legal error, and a rehearing was authorized. *United States v. Bess*, 75 M.J. 70, 77 (C.A.A.F. 2016). The convening authority then referred charges to a new general court-martial. A panel of three officer and two enlisted members, convicted Appellant, an X-ray technician, contrary to his pleas, of two specifications of indecent conduct in violation of Article 120, Uniform

Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2012),[1] for his wrongful requirement that two women undress during their respective X-ray examinations. The court-martial sentenced Appellant to be reduced to the grade of E-3, to be confined for one year, and to be reprimanded. The convening authority approved the adjudged sentence, and the United States Navy-Marine Corps Court of Criminal Appeals (NMCCA) affirmed the findings and sentence. *United States v. Bess*, No. NMCCA 201300311, 2018 CCA LEXIS 476, *33, 2018 WL 4784569, *12 (N-M. Ct. Crim. App. Oct. 4, 2018).

On appeal, Appellant alleges racial discrimination and unlawful influence in the convening authority's selection of members. We granted review to consider three issues:

> I. Whether the convening authority's selection of members violated the equal protection requirements of the Fifth Amendment.
>
> II. Whether the convening authority's selection of members constituted unlawful command influence.
>
> III. Whether the lower court erred in affirming the military judge's denial of Appellant's motion to produce evidence of the racial makeup of potential members.

We answer all three questions in the negative. While racial discrimination is clearly unconstitutional, absent intentional racial discrimination or an improper motive or criteria in the selection of members, the mere fact a court-martial panel fails to include minority representation violates neither the Fifth Amendment nor Article 37, UCMJ, 10 U.S.C. § 837 (2012)'s prohibition against unlawful command influence. Additionally, Appellant's oral discovery request sought irrelevant information, thus the military judge did not abuse her discretion by denying it.

---

[1] The members acquitted Appellant of one specification of indecent conduct and one specification of attempted indecent conduct.

## I. Background

In November 2016, immediately prior to individual voir dire, while the members were not present, Appellant's individual military counsel stated to the military judge: "The defense has noticed that the panel is all white. . . . [O]ur client is African-American, and there's no African-American representation on the panel." Upon further discussion, counsel refined his observation, stating: "I may have misspoke and said that [the members] were all Caucasian, and that might not be true. I am fairly confident that there is no African-American on the panel . . . ." The military judge responded:

> I can't speak to the racial makeup of our panel. I agree with you that I don't see anyone who I think is obviously of the same race as your client, but then again, I would not have known, frankly, that he is of the race he is, absent reviewing materials of the previous case and how his identification was made.

Trial defense counsel did not inquire about the members' races during individual voir dire. Following individual voir dire, the military judge excused five members at defense counsel's request—three of which requests the Government joined—leaving five members on the panel.

In response to trial counsel's request that he explain the basis for his objection to the composition of the panel, individual military counsel explained: "[I]t's . . . basically a combination of an Article 25 challenge and, I guess, it's almost like a preventative *Batson* challenge. If you don't put any African-Americans on the panel from the get-go, then you can't get a *Batson* challenge because nobody is getting eliminated based on their race." The military judge rejected this challenge because of the "absen[ce] [of] any evidence of anything inappropriate being done by the convening authority in assembling the panel."

Individual military counsel then made an oral discovery request for a "statistical breakdown of the population as far as race with respect to the convening authority's command." The military judge denied the request on the grounds the members' questionnaires noted their races and had been available for a week, the request was untimely, acquiring the data would be impracticable, and the resultant statistics were

not relevant absent evidence of impropriety or a pattern of discrimination in other panels, which she had not seen.

Responding to the first reason given by the military judge, individual military counsel countered: "If you look at the questionnaires, only some of them have racial information listed upon the questionnaire." The military judge noted this response but did not change her ruling. In addition, apparently responding to the military judge's statement that she had not seen any pattern of discrimination, individual military counsel said:

> Can I just make a quick record with the last members panel that [the trial counsel], myself, and you were on? We had a different African-American client, and also it was an all-white panel. So, this is the second time in a row that we've been on a case where the same issue has occurred.

The military judge replied that she did not believe that two examples evidenced a pattern.[2] Appellant never moved to stay the proceedings under Rule for Courts-Martial (R.C.M.)

---

[2] Appellant and amicus NAACP now claim the same convening authority detailed all-white panels in three other courts-martial in which the accused was African American. Appellant first introduced this allegation at the NMCCA—not at the court-martial—through a declaration by the Executive Officer of Defense Service Office Southeast. The declaration averred the author sent a letter to the convening authority concerning the racial diversity of members detailed in three recent cases (described without further detail as "*United States v. LTJG Johnson,*" "*United States v. MMC Rollins,*" and "*United States v. LTJG Jeter*"). Without providing a foundation, the letter asserted that in each of those courts-martial, the accused was African American and all of the members were Caucasian. He did not claim the convening authority knew the race of any member detailed to those cases or intentionally excluded any person because of race. Rather, he requested minority representation in his client's case. While it granted the motion to attach the declaration, the NMCCA made no finding of fact as to the truth of any matter alleged therein or the race of any panel member. The declaration further avers that upon receiving the letter, the convening authority amended the court-martial convening order in LTJG Johnson's case to include "one African-American, one Hispanic-American, one Asian-American, one Native-American and one Caucasian female member."

912(b) "on the ground that members were improperly se-
lected."

The record demonstrates that the convening authority
had reason to know that Appellant was African American, as
that information was included in a report that summarized
testimony from the complaining witnesses. The record, how-
ever, contains no evidence that the convening authority either
actually knew or had reason to know the races of the members
when he detailed them to Appellant's court-martial.[3] As dis-
cussed *infra* Part II.C., none of the members selected were
from his command, and all members confirmed during voir
dire they neither personally knew nor worked with the con-
vening authority. Moreover, only one member's questionnaire
asked for the member's race. That member checked a box for
"Caucasian." The other members were not asked, and did not
provide, any information about their races. Though he re-
ceived the trial questionnaires a week before trial, trial de-
fense counsel neither objected to the questionnaires nor re-
quested supplemental questionnaires.[4]

---

[3] The NMCCA found that, excepting the one member whose
questionnaire indicated race, there was "no evidence that the CA
knew the race of any of the . . . members detailed to the court-mar-
tial" and "no reason to suspect that the CA personally knew [the
members] and would therefore have known their race." 2018 CCA
LEXIS 476, at *25, 2018 WL 4784569, at *10. The Courts of Crimi-
nal Appeals have factfinding authority under Article 66, UCMJ, 10
U.S.C. § 866 (2012); under Article 67, UCMJ, 10 U.S.C. § 867
(2012), we do not. *See, e.g.*, *United States v. Piolunek*, 74 M.J. 107,
110 (C.A.A.F. 2015). Where, as here, a CCA's findings are neither
clearly erroneous nor unsupported by the record, this Court defers
to those factual findings. *United States v. Tollinchi*, 54 M.J. 80, 82
(C.A.A.F. 2000).

[4] In his initial written discovery request, Appellant requested
the Government produce "Panel Selection" information, including
court-martial member questionnaires responsive to the items listed
in R.C.M. 912(a)(1), which includes race, "all written matters pro-
vided to the convening authority concerning selection of the mem-
bers detailed to the court-martial" under R.C.M. 912(a)(2), and "all
information known to the government as to the identities of poten-
tial alternate and/or additional panel members." Appellant never
followed up on these requests, despite filing a supplemental discov-
ery request "highlight[ing] material discovery yet to be delivered"

After the trial, Appellant's counsel submitted a request for clemency to the convening authority, asserting that "[b]ased on *Batson* principles, the military judge should have required the Convening Authority to articulate the non-race based reason for excluding all African-Americans, but [the military judge] did not. This was prejudicial error."[5] The convening authority denied relief, approving the findings and sentence. The NMCCA affirmed. 2018 CCA LEXIS 476, at *33, 2018 WL 4784569, at *12.

---

and, later, a motion to compel "discovery which is material to the preparation of the defense." The only material in the record responsive to discovery requests regarding the panel is the member questionnaires, but the defense never presented the other requests to the military judge as R.C.M. 912 permits.

[5] Appellant also raised this argument to the military judge, and the NMCCA. 2018 CCA LEXIS 476, at *23–24, 2018 WL 4784569, at *9. In his briefing to this Court, Appellant urges a "workable process" outside of Article 25, UCMJ, 10 U.S.C. § 825 (2012), wherein:

> First, the defense identifies that the panel does not include any members from the same cognizable racial group as the accused and raises the issue with the military judge before the members are empaneled, *requesting to have the convening authority detail additional members of the same race as the accused.* The military judge, after appropriately inquiring into the matter, then adjourns the *voir dire* proceedings so that the convening authority can be notified. Finally, upon notification, the convening authority . . . either details additional members on the basis of race for the purpose of inclusion or provides a race-neutral reason for declining to do so.

Reply Brief for Appellant at 6–7, *United States v. Bess,* No. 19-0086 (C.A.A.F. July 29, 2019) (emphasis added). There is no procedure to ensure a particular racial composition in any court in the United States, and, as discussed *infra* Part II.A., the legal precedent is to the contrary. While the process is both different than its civilian counterpart and the subject of numerous appeals, if what Appellant seeks is an extraconstitutional and radical overhaul of Article 25, UCMJ, and the member selection system in the military—a system that has been in place for a very long time—his suggestions are better addressed to Congress. No one has challenged the constitutionality or soundness of Article 25, UCMJ, and we decline to judicially craft a rule encroaching on Congress's legislative province.

The NMCCA found the military judge erred in declaring that the defense objection was untimely and that she was mistaken about the content of the questionnaires, but concluded she did not abuse her discretion. The NMCCA found that the requested data was "irrelevant" because trial defense counsel had asked for the racial makeup of the convening authority's "command" instead of the convening authority's "pool of available members," and no members were selected from the convening authority's command. 2018 CCA LEXIS 476, at *22, 2018 WL 4784569, at *8. The NMCCA also rejected the claim of unlawful command influence, citing a lack of evidence concerning the convening authority's knowledge of the races of members detailed to the court-martial. 2018 CCA LEXIS 476, at *25–27, 2018 WL 4784569, at *9–10. Additionally, the NMCCA found no precedent to extend *United States v. Batson,* 476 U.S. 79 (1986), to the convening authority's selection of members and held the mere absence of African Americans on the panel did not demonstrate systematic exclusion. 2018 CCA LEXIS 476, at *23–24, 2018 WL 4784569, at *9.

## II. Discussion

The issues in this case are relatively straightforward. Appellant's complaint at trial rested on his supposition that the court-martial didn't include members of his race; his complaints on appeal allege violations of the Due Process Clause of the Fifth Amendment and Article 37, UCMJ, because he objected to the panel composition and no action was taken. Moreover, Appellant appears to believe that the fact a court-martial panel doesn't include members of an accused's race remedies deficient requests for irrelevant discovery at trial, or otherwise entitles an accused on appeal to further factfinding at a *DuBay*[6] hearing. His arguments—both at trial and now—have no support in the law for the reasons set forth below.

### A. The Fifth Amendment

Appellant argues that the convening authority's selection of members violated the Fifth Amendment's implicit guarantee of equal protection of the laws. We review this question of

---

[6] *United States v. DuBay*, 17 C.M.A. 411, 37 C.M.R. 411 (1967).

law de novo. *See United States v. Riesbeck*, 77 M.J. 154, 162 (C.A.A.F. 2018).[7]

The sole basis for Appellant asserting a constitutional violation *at trial* was his claim that there were no African American members included on his court-martial panel and one other. There are several logical flaws with this. First, because the questionnaires did not have this information, and because Appellant declined to inquire into the races during voir dire, we don't know with certainty what race any member save one identifies as. Second, there is no constitutional or statutory right to have members of your own race (or any other) included on either a court-martial panel or a civilian jury. *See Powers v. Ohio*, 499 U.S. 400, 404 (1991). And third, there is precisely zero evidence that this convening authority knew or had reason to know the race of the persons he detailed to the court-martial or engaged in any impropriety.

What the Fifth Amendment provides is not a promise to include, but rather protection against intentional racial discrimination through exclusion. *Cf. Flowers v. Mississippi*, 139 S. Ct. 2228, 2242 (2019) ("Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process."); *Batson*, 476 U.S. at 93 ("As in any equal protection case, the burden is, of course, on the defendant who alleges discriminatory selection of the venire to prove the existence of purposeful discrimination." (internal quotation marks omitted) (citation omitted)); *United States v. Santiago-Davila*, 26 M.J. 380, 390 (C.M.A. 1988) (Fifth Amendment equal protection includes the "right to be tried by a jury from which no 'cognizable racial group' has been excluded." (quoting *Batson*, 476 U.S. at 96)).

Neither in civilian courts nor in a court-martial does the Fifth Amendment guarantee an accused jurors or members

---

[7] The Government asserts that we should review the Fifth Amendment issue for plain error because Appellant at trial did not specifically argue that a racial group was systematically excluded from his court-martial panel in violation of the standards set forth in *Castaneda v. Partida*, 430 U.S. 482 (1977). We conclude that Appellant's citation of *Batson*, 476 U.S. 79, and reference to a possible pattern of discrimination in recent cases adequately preserved his Fifth Amendment arguments.

who are of the same race. *See, e.g.*, *Powers*, 499 U.S. at 404; *Batson*, 476 U.S. at 85; *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975); *Virginia v. Rives*, 100 U.S. 313, 323 (1879); *United States v. Adkinson*, 916 F.3d 605, 609 (7th Cir. 2019); *Sanchez v. Roden*, 753 F.3d 279, 290 (1st Cir. 2014); *United States v. Mitchell*, 502 F.3d 931, 952 (9th Cir. 2007); *Lowery v. Cummings*, 255 F. App'x 409, 420 (11th Cir. 2007); *United States v. Brooks*, 161 F.3d 1240, 1246 (10th Cir. 1998); *United States v. Steen*, 55 F.3d 1022, 1030 (5th Cir. 1995).

An accused has an absolute right to a fair and impartial panel, guaranteed by the Constitution and effectuated by Article 25, UCMJ's member selection criteria and Article 37, UCMJ's prohibition on unlawfully influencing a court-martial. *See also Riesbeck*, 77 M.J. at 163. Neither of those articles requires affirmative inclusion. Rather, Article 25(d)(2), UCMJ, provides in relevant part: "When convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Race is not one of the criteria.[8] And by its terms, Article 37(a), UCMJ, expressly prohibits the convening authority

---

[8] This Court has held, however, that the convening authority may consider race in detailing members if that consideration serves "deliberately to include qualified persons," rather than to exclude members based on race. *United States v. Crawford*, 15 C.M.A. 31, 41, 35 C.M.R. 3, 13 (1964); *see also Riesbeck*, 77 M.J. at 163 (*Crawford* allows a convening authority to "seek[] in good faith to make the panel more representative of the accused's race or gender"). Even these decisions are constitutionally problematic in some sense, given that they seemingly stem from some notion that an accused "has a better chance of winning if more members of his race are on the jury. But that thinking relies on the very assumption that *Batson* rejects: that jurors might be partial to the defendant because of their shared race." *Flowers*, 139 S. Ct. at 2270 (Thomas, J., dissenting) (internal quotation marks omitted) (citation omitted); *see also Castaneda*, 430 U.S. at 499 ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."). In any event, "may" does not equate to "must."

from selecting members in an attempt to influence the outcome of the court-martial, on the basis of race or otherwise. *See infra* Part II.C.

Of course, if a convening authority, in selecting the members to detail to a court-martial, intentionally *excluded* potential members on the basis of race, the convening authority's actions would be unconstitutional. But that is entirely different than a mere failure to *include*, which is what Appellant complained of at trial, and which many courts, *see supra*, including our Court in *United States v. Loving*, found insufficient to support a Fifth Amendment claim. 41 M.J. 213, 285 (C.A.A.F. 1994) ("A *prima facie* case of systematic exclusion is not established by the absence of minorities on a single panel.").

### B. Request to Extend *Batson* and Apply *Castaneda*

Nevertheless, *on appeal* Appellant now urges us to apply the frameworks of either *Batson* or *Castaneda* to find that the absence of African Americans on his panel constitutes an equal protection violation. We decline this invitation.

1.

*Batson* held that, under the Equal Protection Clause, *peremptory strikes* of an African American from the jury venire may establish a prima facie case of purposeful discrimination, and once that prima facie case is established, the burden shifts to the government to provide a race-neutral explanation for the strike. 476 U.S. at 96–97.

> Just as the Equal Protection Clause forbids the States to exclude black persons from the venire on the assumption that blacks as a group are unqualified to serve as jurors, so it forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black. The core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' race.

*Id.* at 97–98. The Court's holding further took into account the fact that peremptory strikes may "permit those to discriminate who are of a mind to discriminate," *id.* at 96 (internal

10

quotation marks omitted) (citation omitted), and previous cases imposed too high a bar by requiring proof of repeated racial strikes outside of the defendant's particular case, *id.* at 92–93. Recognizing the truism that "the Constitution prohibits all forms of purposeful racial discrimination in selection of jurors," *id.* at 88, the Court distilled from its broad discussion of equal protection principles the narrow conclusion that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96.

*Batson* procedures do apply in the military justice system when a party makes a peremptory challenge, *Santiago-Davila*, 26 M.J. at 389–90, but the narrow terms of *Batson*'s holding neither compel nor impel us to extend it to a convening authority's selection of members, the manner of which Article 25, UCMJ, limits and directs, even if his supposition about the race of his panel's members was an established fact. Nor does Appellant cite any precedent that would require extending *Batson*'s holding outside the context of peremptory challenges. Indeed, the only extensions of *Batson* have been within the peremptory strike context itself. *See Flowers*, 139 S. Ct. at 2243 (recognizing application to gender discrimination, criminal defendant's peremptory strikes, and civil cases).[9]

---

[9] Other federal and state courts have held that *Batson* should not be extended to other contexts. *See, e.g.*, *United States v. Elliott*, 89 F.3d 1360, 1364–65 (8th Cir. 1996) ("*Batson* applies only to peremptory strikes. We know of no case that has extrapolated the *Batson* framework to for-cause strikes."); *State v. Gould*, 142 A.3d 253, 261 (Conn. 2016) ("[T]he *Batson* framework has been limited to peremptory challenges.").

2.

*Castaneda* is not so limited in scope. Nevertheless, even if *Castaneda*'s framework for addressing systematic discrimination in the selection of grand jurors *could* be extended to a convening authority's selection of court-martial members, it would not change the outcome in this case. There, in evaluating a prisoner's claim alleging systematic discrimination against Mexican Americans in the selection of members of the grand jury that indicted him, 430 U.S. at 485–86, the Supreme Court held that there is a three-step process for making a prima facie showing that a procedure employed for selecting grand jurors violates the Equal Protection Clause. *Id.* at 494. The Supreme Court explained:

> The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. *Hernandez v. Texas*, 347 U.S. [475, 478–479 (1954)]. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. *Id.* at 480. . . . Finally, . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. *Washington v. Davis*, 426 U.S. [229, 241 (1976)]; *Alexander v. Louisiana*, 405 U.S. [625, 630 (1972)].

*Id.*[10]

We have not determined whether and how *Castaneda* applies in the military justice system where specific criteria for selecting members exist, *see* Article 25, UCMJ, none of which are race, and where deployments and other factors would likely skew a straight percentage comparison. Yet, in *Loving*, we ruled that the absence of minorities on a single court-martial panel does not make out a prima facie case of systematic exclusion. 41 M.J. at 285. To support this rule, we noted that a prima facie case of underrepresentation was established in *Castaneda* "by comparing [the] population 'to the proportion

---

[10] Though *Castaneda* itself dealt with grand jurors, its framework applies to petit jury veniers as well. *See Batson*, 476 U.S. at 94.

called to serve . . . over a significant period of time.'" *Id.* (internal quotation marks omitted) (quoting *Castaneda*, 430 U.S. at 494). In particular, that prisoner presented statistics, which the government did not contest, showing that 79.1% of his county's population was Mexican American, but that over an eleven-year period, only 39% of grand jurors in the county were (or appeared to be) Mexican American. *Castaneda*, 430 U.S. at 486–87.

Were *Castaneda* to apply—however imperfectly given the unique characteristics of the military justice system—we need decide nothing more than that Appellant fails to meet the second prong of *Castaneda*. Appellant and the amicus NAACP have proffered allegations that within a one-year period, the convening authority detailed all-white panels in four cases. Even if mere allegations constitute competent evidence (and we do not believe they do), one year is not a "significant period of time" and would not establish a prima facie case under the *Castaneda* framework. *See, e.g.*, *Hobby v. United States*, 468 U.S. 339, 341 (1984) (seven years was significant period); *Castaneda*, 430 U.S. at 487 (eleven years was significant period); *United States v. Quinones*, No. 93-10751, 1995 U.S. App. LEXIS 1635, at *30–31, 1995 WL 29500, at *10–11 (9th Cir. Jan. 25, 1995) (unpublished) (one year of data insufficient); *Ramseur v. Beyer*, 983 F.2d 1215, 1233 (3d Cir. 1992) (two years was not significant period); *Bryant v. Wainwright*, 686 F.2d 1373, 1377–78 (11th Cir. 1982) (minor statistical variations over five-year period insufficient).[11] What we said in *Loving*—that the absence of minorities on a single panel does not make out a prima facie case of systematic exclusion—is likewise true if there are allegations concerning several panels over a short period of time. *See Bryant*, 686 F.2d at 1379 (for grand jury foreperson selection, "ten selections

---

[11] Of note, *Castaneda* itself involved a process wherein the authority selecting grand jurors turned over periodically: under the "key man" system, the state district judge would appoint three to five jury commissioners, those commissioners would then select the pool of grand jurors, and the judge would then test their qualifications. 430 U.S. at 484. The district judge who impaneled the respondent's grand jury was in charge for only two and one-half years of the eleven-year period considered in that case. *Id.* at 495–96.

from a brief three and one-half year period simply is not sufficiently large to allow a meaningful statistical comparison"); *cf. Truesdale v. Moore*, 142 F.3d 749, 756 (4th Cir. 1998) ("[A]llegations of statistical disparity will not suffice to show a violation of the Fourteenth Amendment where no discriminatory purpose was afoot.").

The case law makes clear that even if no African American members were included in Appellant's case, a fact that is unknown, even when combined with other anecdotal allegations raised by the trial defense counsel and now amici and the appellate defense counsel, it does not establish a prima facie case of exclusion based on race. Rather, we cleave to the ordinary rule that without contrary indication, "the presumption of regularity requires us to presume that [the convening authority] carried out the duties imposed upon him by the Code and the Manual." *United States v. Wise*, 6 C.M.A. 472, 478, 20 C.M.R. 188, 194 (1955); *see also United States v. Scott*, 66 M.J. 1, 4 (C.A.A.F. 2008) (applying a "presumption of regularity" to the convening authority's actions (internal quotation marks omitted) (citation omitted)). We thus presume the convening authority acted in accordance with Articles 25 and 37, UCMJ, here. The military judge stated that she had "not seen any indication of any pattern of discrimination by excluding minority members" in prior panels, or any indication of impropriety by the convening authority. Based on our review of the record and the pertinent case law, we agree with the military judge.[12]

## C. Unlawful Influence

Appellant also fails to show unlawful command influence. We review such claims de novo. *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013). Article 37(a), UCMJ, provides in relevant part: "No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the

---

[12] We reject Appellant's suggestion that the military judge's denial of his discovery request "compound[ed] the prejudice" by preventing him from producing evidence to support his equal protection claim. As discussed below in Part II.D., the military judge properly denied the request because it sought irrelevant information and the request would not have furthered Appellant's equal protection or unlawful command influence claims.

action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case." Court stacking is a form of unlawful command influence. *Riesbeck*, 77 M.J. at 165. For actual unlawful command influence, the accused must show beyond "mere . . . speculation": (1) facts, that if true, constitute unlawful command influence; (2) the prior proceedings were unfair; (3) the unlawful command influence caused the unfairness. *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999).

On one end of the spectrum are cases like *Riesbeck*, where we found unlawful court stacking because, inter alia, the record "paint[ed] a clear picture of court stacking based on gender in an atmosphere of external pressure to achieve specific results in sexual assault cases," the panel was "seventy percent female, most of whom [were] victim advocates," the enlisted pool "was only thirteen percent female," and the impaneling authorities thought it " 'very important' to have a 'large number of women' " decide the case, 77 M.J. at 164, 166.

On the other end of the spectrum are cases like *United States v. Lewis*, where we found no improper motive when presented with a statistically high and anomalous number of women on the panel given the comparatively low number of women on panels over the preceding three years at the same air force base. 46 M.J. 338, 339, 341–42 (C.A.A.F. 1997); *see also id.* (bare numbers in unit strength report showing total officers and enlisted members as well as how many were women "d[id] not adequately reflect the pool of individuals eligible and available to serve as court members," so did not evidence improper selection). The paucity of evidence here is even greater than that found to be deficient in *Lewis*.

The record shows the convening authority neither knew nor had reason to know the races of nine of the ten members whom he detailed to Appellant's court-martial; it does not reveal with certainty the actual racial makeup of Appellant's panel; it contains no findings of fact by the NMCCA with respect to allegations regarding the races of members in other courts-martial, and at most Appellant presents a potential anomaly with a few cases within a short period of time, with no evidence whatsoever of intentional discrimination. Appellant fails to carry his burden to show unlawful command influence by more than mere speculation. With due respect to

the dissents, *United States v. Bess*, __ M.J. __ , __ (5 n.5, 12) (Ohlson, J., with whom Sparks, J., joined, dissenting) (C.A.A.F. 2020); *id.* at __ (2) (Sparks, J., with whom Ohlson, J., joined, dissenting), the mere absence of African Americans on Appellant's panel does not itself raise reasonable doubt as to the procedure used to select his panel. *See supra* Part II.A.

Nor does Appellant show apparent unlawful command influence—that "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *United States v. Boyce*, 76 M.J. 242, 249 (C.A.A.F. 2017) (internal quotation marks omitted) (citation omitted). A fully informed observer would know the convening authority only knew one member's race, that no member knew or worked with the convening authority, and—taking the declaration at face value— the convening authority was amenable to including diverse members when asked to do so, which Appellant failed to do prior to trial. Appellant presents no reasonable grounds for "an objective, disinterested observer, fully informed of all the facts and circumstances"—to include the legal fact that no one is entitled to members of the same race in either a military or civilian court—to "harbor a significant doubt about the fairness of the proceedings." *Id.* (internal quotation marks omitted) (citation omitted).

### D. Appellant's Discovery Request

The third assigned issue is whether the NMCCA erred in affirming the military judge's denial of the oral discovery request that Appellant made at trial. We review a military judge's ruling on a request for production of evidence for an abuse of discretion. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004). A military judge abuses her discretion when her findings of fact are clearly erroneous or her ruling is influenced by an erroneous view of the law. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008). A military judge also abuses her discretion when a "decision . . . is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Criswell*, 78 M.J. 136, 141 (C.A.A.F. 2018) (internal quotation marks omitted) (quoting *United States v. Irizarry*, 72 M.J. 100, 103 (C.A.A.F. 2013)).

16

An accused is entitled to production of "relevant and necessary" evidence. R.C.M. 703(f)(1). Appellant requested "a statistical breakdown of the population as far as race with respect to the convening authority's command." The military judge denied the request on three grounds, and as noted *supra* Part I, the NMCCA disagreed with her in part but upheld the denial for a different reason, which is permissible. *See Murr v. Wisconsin*, 137 S. Ct. 1933, 1949 (2017) (explaining that a "judgment below . . . may be affirmed on any ground permitted by the law and record"); *United States v. Robinson*, 58 M.J. 429, 433 (C.A.A.F. 2003) (affirming a military judge's denial of a motion to suppress evidence where "the military judge reached the correct result, albeit for the wrong reason").

We agree with the NMCCA that the information sought by Appellant was irrelevant because, in fact, the information requested had little to do with the available pool of members. We further conclude that the information requested is not relevant because it would do nothing to add to the legal force of his observation at trial that he was African American and it appeared the members were not. Just as the bare population statistics in the unit strength report in *Lewis* did "not adequately reflect the pool of individuals eligible and available to serve as court members," 46 M.J. at 341–42, so too would Appellant's request here not produce relevant information. In *Lewis*:

> [w]ith respect to the officer members, [the evidence did] not reflect how many officers were ineligible or disqualified because of their involvement in law enforcement or the investigation of this case, and it [did] not reflect how many were unavailable because of absence from the command or operational duties. With respect to the enlisted members, the defense evidence lack[ed] the same information. In addition, it fail[ed] to identify how many enlisted airmen were presumptively unqualified because they lacked the experience and maturity contemplated by Article 25, UCMJ, 10 U.S.C. § 825.

*Id*. Appellant's request for a racial breakdown of the convening authority's command suffers the same shortcomings. First, the request covered only the convening authority's command, which is only a subset of the total eligible pool of members. Second, a racial breakdown alone does not reveal

17

enough detail to discern who would be eligible to serve on a panel. As *Lewis* describes, far more factors bear on that determination, *see id.*, and that is the legally relevant question.

Appellant's argument is that although trial defense counsel specifically asked for statistical information concerning the convening authority's command, this was clearly meant to include everyone whom the convening authority could detail to the court-martial. Appellant asserts that trial defense counsel's broad meaning is discernible from the military judge's response that the discovery request was impracticable.

We agree that the wording of any motion must be understood in the context in which it was made, especially an oral motion in the middle of a trial. *See* R.C.M. 905(a). But in this case, Appellant's argument about what the context shows is unpersuasive. Looking at the entire exchange, the most reasonable understanding of Appellant's request was that he was seeking only the information that he asked for. Moreover, even if he had received what he *now* says he wanted, it would still do nothing to change the legal landscape.[13] The military judge did not abuse her discretion in denying Appellant's oral discovery request.

### E. Appellant is Not Entitled to a *DuBay* Hearing

Finally, Appellant argues that, in the alternative, he is entitled to a *DuBay* hearing. A creature of judicial fiat rather than statute, *see United States v. Ginn*, 47 M.J. 236, 243 (C.A.A.F. 1997); *United States v. Ingham*, 42 M.J. 218, 224 (C.A.A.F. 1995), the *DuBay* hearing was created to permit an accused to gather additional evidence and resolve conflicting evidence where (1) an issue, such as ineffective assistance of counsel, was discovered after trial, *see Ginn*, 47 M.J. at 244, or (2) a request made at trial was improperly denied, *see*

---

[13] The *Castaneda* framework and the unlawful influence framework require a proffer of something more than statistical disparity. As explained above, Appellant still fails the *Castaneda* requirement of a comparison of the statistics over a significant period of time, and the unlawful influence framework requires some evidence of improper motive. In sum, the mere racial composition of a court-martial, without more, does not make discovery into the detailing process relevant and necessary.

*United States v. Riesbeck*, No. 1374, slip op. at 1 (C.G. Ct. Crim. App. Jan. 20, 2015). The goal in either case is to develop a record so that the appellate court can resolve the issues presented. *United States v. Flint*, 1 M.J. 428, 429 (C.M.A. 1976). But it is decidedly *not* the case that a *DuBay* hearing is either necessary or warranted in an instance, such as this case, where there was no effort made at trial to develop a record on any relevant facts, and the claims on appeal rest on pure speculation. *Cf. Ingham*, 42 M.J. at 224.

We have long held that where a post-trial claim is inadequate on its face, or facially adequate yet conclusively refuted by the record, such a hearing is unnecessary. *United States v. Campbell*, 57 M.J. 134, 138 (C.A.A.F. 2002). "[T]he threshold triggering further inquiry should be low, but it must be more than a bare allegation or mere speculation." *United States v. Johnston*, 39 M.J. 242, 244 (C.M.A. 1994). Because the appellant in *Johnston* showed "not a scintilla of evidence" of unlawful command influence, the Court declined to order a hearing. *Id.* at 244–45. And that's what we face in this case: "not a scintilla of evidence" the convening authority even knew the race of more than one person detailed to the panel or had any malintent in exercising his duty under Article 25, UCMJ. Moreover, the population statistics Appellant now seeks would, as in *Lewis*, prove nothing.

This case differs from *Riesbeck*. There, defense counsel at trial produced evidence that, inter alia, the member questionnaires indicated each member's gender; the convening order was amended multiple times to add women; the final panel had seven women, five of whom were victim's advocates; and defense counsel produced the rosters of potential members. *United States v. Riesbeck*, No. 1374, 2014 CCA LEXIS 946, at *7–11 (C.G. Ct. Crim. App. Aug. 5, 2014) (unpublished). It similarly differs from cases like *United States v. Sales*, where "there [was] a reasonable probability that there would have been a different result if the factual conflicts among the affidavits were resolved in appellant's favor" regarding his ineffective assistance of counsel claim. 56 M.J. 255, 258 (C.A.A.F. 2002). These cases presented a dispute of material fact or otherwise raised a reasonable possibility of a colorable claim that could be developed through a *DuBay* hearing. The record here does neither: only one questionnaire indicated race; there is

zero evidence that the convening order was amended to add or remove racially representative members for this particular case;[14] the record does not reflect with certainty the actual racial composition of Appellant's panel. Appellant's speculative assertions do not merit a *DuBay* hearing.

And the military judge did not erroneously deny Appellant's opportunity to develop the equal protection and unlawful command influence claims—fully articulated only on appeal—which were grounded in truth on nothing more than suppositions about the racial composition of his panel. First, the military judge properly denied his mid-voir dire oral discovery request. *See supra* Part II.D. Second, while Appellant did include a broader request for panel selection information in an initial discovery request and the record does not show what—beyond the member questionnaires—he received in return, this appeared not to concern Appellant at the time. *See supra* note 4.

Appellant's supplemental discovery request did not reiterate the request for panel selection information; Appellant's subsequent motion to compel did not ask for the information; the military judge thus made no ruling with respect to the request for panel selection information in that June 2016 request; and Appellant did not assign any errors at this Court or the NMCCA regarding that June 2016 discovery request, *see supra* Part I; *Bess*, 2018 CCA LEXIS 476, at *2–3, 2018 WL 4784569, at *1. Nor did Appellant move to stay the proceedings on the ground that improper selection criteria were used by the convening authority. *See* R.C.M. 912(b)(1).

To the extent Appellant now seeks information that was available yet neither requested nor pursued at trial, Appellant has waived any right to further exploration in a *DuBay* hearing. *See United States v. Curtis*, 44 M.J. 106, 133 (C.A.A.F. 1996) ("If the defense wanted to explore the convening authority's role and knowledge [in appointing members], they could have raised this issue at trial. Because it was not raised at trial, we hold that this issue was waived.").

---

[14] The single change to the convening order appears to be only in response to Appellant's request for enlisted representation.

## III. Conclusion

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

Judge MAGGS, concurring in part and concurring in the judgment.

I concur in the judgment affirming the U.S. Navy-Marine Corps Court of Criminal Appeals, and I join all of the Court's opinion except for Part II.B.1. In Part II.B.1., Judge Ryan, joined by Chief Judge Stucky, concludes that Appellant's argument based on *Batson v. Kentucky*, 476 U.S. 79 (1986), lacks merit. I agree that Appellant's argument lacks merit but, as I explain below, my reasoning is different.

## I. Analysis

Appellant makes two arguments advancing his claim under the Fifth Amendment. One argument is based on *Castaneda v. Partida*, 430 U.S. 482 (1977), a decision concerning the selection of grand jurors. Appellant acknowledges that "*Castaneda* is not a perfect fit as precedent" given the differences between court-martial panel selection and grand jury selection. But Appellant argues that we should adapt *Castaneda*'s analysis for deciding when court-martial member selection violates the equal protection guarantee implicit in the Fifth Amendment. He asserts that, under *Castaneda* as it should be adapted to the military justice system, he has established a prima facie equal protection violation by showing (1) that he is African American, (2) that "African-Americans were not only excluded from (and underrepresented on) the panel in [his] case, but in a series of cases," and (3) that "the selection process set out in Article 25, UCMJ, is susceptible to abuse due to the inherent subjectivity involved."

 In addressing Appellant's argument, the Court recognizes that "[w]e have not determined whether and how *Castaneda* applies in the military justice system." The Court then decides that resolving these constitutional issues is unnecessary because the record does not establish one of the factual predicates of Appellant's argument. The Court explains: "Were *Castaneda* to apply—however imperfectly given the unique characteristics of the military justice system—we need decide nothing more than that Appellant fails to meet the second prong of *Castaneda*." Put simply, for reasons the Court demonstrates, the record does not establish that African Americans in fact have been excluded from panels for a significant period. I agree with the Court's restrained approach.

There is no need to decide how *Castaneda* might apply in the military justice system when the facts do not present the issue. *See City of W. Covina v. Perkins*, 525 U.S. 234, 244 (1999) (reasoning that when the record "undermines the factual predicate for [an] . . . argument . . . we need not discuss it further").

Appellant's other argument advancing his Fifth Amendment claim is based on *Batson*, a case concerning peremptory challenges to members of the venire. Appellant recognizes that the *Batson* precedent is also "not a perfect fit" in a case involving a convening authority's selection of panel members, but he argues that the Court can use *Batson* as a "guidepost." Appellant contends that if (1) "the defense identifies that the panel does not include any members from the same cognizable racial group as the accused" and (2) "raises the issue with the military judge before the members are empaneled," then the equal protection principle in *Batson* requires the convening authority either to "detail[] additional members on the basis of race for the purpose of inclusion or provide[] a race-neutral reason for declining to do so."

In my view, the Court ought to address Appellant's *Batson* argument in the same restrained manner that it addresses Appellant's *Castaneda* argument. Specifically, we need decide nothing more than that the record does not establish the factual predicate for Appellant's proposed constitutional test. For the reasons thoroughly explained by the Court, the record in this case does not establish that the "panel [did] not include any members from the same cognizable racial group as the accused."[1] Accordingly, we do not need and have no reason to decide the important and difficult issues of whether or how *Batson* hypothetically might apply to member selection by the

---

[1] I see no reason to question the good faith of Appellant and his counsel in assuming that none of the panel members at his court-martial was African American based on outward appearances. But this Court cannot rely on this assumption in deciding this case because nothing in the record provides a basis for concluding that the assumption is correct. The military judge made no finding as to the members' races and explained that she was uncertain of their races based on their appearances. She properly refused to infer their races based on stereotypes.

convening authority. For this reason, I do not join Part II.B.1. of the Court's opinion.

The conclusion that Appellant has not established the factual predicate necessary for his *Batson* argument raises the question whether we should order a hearing pursuant to *United States v. DuBay*, 17 C.M.A. 147, 37 C.M.R. 411 (1967), to allow Appellant to discover the race of each of the members at his court-martial. Our decision in *United States v. Curtis*, 44 M.J. 106 (C.A.A.F. 1996), *on reconsideration*, 46 M.J. 129 (C.A.A.F. 1997), answers this question. In *Curtis*, the appellant requested a *DuBay* hearing to determine whether the convening authority knew that he could have appointed a panel of all enlisted members under Article 25, UCMJ, 10 U.S.C. § 825. 44 M.J. at 132. We rejected the request for the *DuBay* hearing, explaining: "If the defense wanted to explore the convening authority's role and knowledge, they could have raised this issue at trial. Because it was not raised at trial, we hold that this issue was waived." *Id.* at 133.

The same conclusion follows here. The inadequate record regarding the members' races in this case was not inevitable. Appellant could have insisted, through a motion to compel, that all of the questionnaires submitted to the members asked the members to identify their races. *See* Rule for Courts-Martial 912(a)(1)(C) (expressly requiring questionnaires to include this question upon the request of defense counsel). Appellant, however, made no such motion. Although Appellant timely requested that trial defense counsel submit questionnaires to each of the members the convening authority detailed to his panel, he did not move to compel that all the questionnaires include a question regarding the member's race. And even after Appellant had seen the members detailed to his court-martial, and had raised an issue about the composition of the panel, he gave up a second opportunity to inquire about their races. Both sides agreed at oral argument that trial defense counsel could have asked the members during individual voir dire to identify their races, but trial defense counsel did not do so. Because Appellant did not avail himself of either of these opportunities to determine the races of the members of his panel, he has waived any right to further discovery regarding the members' races in a *DuBay* hearing.

## II. Conclusion

For these reasons, I agree with the conclusion in Part II.B.1. that Appellant's *Batson* argument lacks merit. But I would not resolve the legal questions of whether or how *Batson* principles might apply to member selection by the convening authority because those questions are not presented by the facts. Given that there is no majority view on those issues in this case, they remain open for decision if the record in a case ever properly presents them.

Judge OHLSON, with whom Judge SPARKS joins, dissenting.

The record before this Court unquestionably compels the remand of this case for an evidentiary hearing in order to ensure that Appellant's court-martial was not subject to the pernicious effects of unlawful command influence, and to ensure that Appellant's constitutional right to equal protection under the Fifth Amendment was not violated by the impermissible exclusion of panel members on the basis of race. Because the majority holds to the contrary, I must respectfully dissent.

## I. Unlawful Command Influence

Issue II in this case reads as follows: "Whether the convening authority's selection of members constituted unlawful command influence." *United States v. Bess*, 79 M.J. 46 (C.A.A.F. 2019) (order granting review). As we recently held in *United States v. Boyce*, 76 M.J. 242, 248 (C.A.A.F. 2017), "[T]he appearance of unlawful command influence [exists] where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceedings." Thus, it is necessary to begin an analysis of this case by reviewing "all the facts and circumstances" relevant to the issues before us.

The filings and the joint appendix reflect the following:

- Appellant was an African American male who was charged with sex-related offenses. His accusers were white females.

- Appellant's defense was mistaken identity caused by difficulties with cross-racial identification. Specifically, Appellant argued that his white accusers confused him with a different but similar-looking African American male who also worked as an x-ray technician at the hospital where the offenses occurred. Brief for Appellant at 12–20, *United States v. Bess*, No. 19-0086 (C.A.A.F. June 19, 2019).

- As in all criminal cases in the military, the commander who convened Appellant's court-martial personally selected the venire panel. That is, he selected the pool of

personnel from which the court-martial panel members (i.e., the jurors) ultimately would be chosen. Thus, it is essential to note that *there was nothing random about the selection of the venire panel in this case. See* Articles 22 and 23, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 822, 823 (2012).

- As soon as the members of the venire panel walked into the courtroom, Appellant observed that each and every one of them appeared to be white.[1]

- During voir dire, trial defense counsel challenged the racial composition of the panel. He pointed out to the military judge that all of the panel members appeared to be white, and he also noted that *this was the second court-martial in a row* where the accused was African American but all of the panel members appointed by this particular convening authority appeared to be white.[2] Trial defense counsel characterized his motion

---

[1] In a request for clemency after Appellant's conviction, trial defense counsel described the scene in the courtroom as follows:

> At the beginning of the trial, a white military judge, asked a white bailiff, to call in the all-white military venire panel. As the white defense attorneys and the white prosecutors stood at attention as the panel members filed in, it was difficult to reassure HM2 Bess as he leaned over to ask, "Why aren't there any black people?" This all-white panel would hear evidence from the four complaining witnesses in the case—each of them white.

[2] In a sworn declaration written after Appellant's court-martial but included in the Joint Appendix to this case, Commander Christopher W. Czaplak, JAGC, USN, the Executive Officer of Defense Service Office Southeast, cited a letter he sent to the Commander, Navy Region Mid-Atlantic, which stated in relevant part:

> There is an appearance in the Central Judicial Circuit that race is being improperly considered when selecting members for General Court-Martial Convening Orders. In a number of cases, most recently *United States v. HM2 Bess*, *United States v. MMC Rollins*, and *United States v. LTG Jeter* where defense counsel have raised this issue, African-Americans were convicted in the Central Judicial Circuit by all-white panels. All of the members detailed [by

"almost like a preventative *Batson* challenge."**3**

---

the convening authority] to the courts-martial of these accused were Caucasian. By contrast, minority members have been detailed to cases involving Caucasian accused facing court-martial for sexual assault . . . .

Further, an amicus brief submitted to this Court by the NAACP Legal Defense & Educational Fund, Inc., states that during the course of one year this particular convening authority "detailed *four* all-white panels for *four* Black defendants charged with sex-related offenses." Brief of Amicus Curiae NAACP Legal Defense & Education Fund, Inc., in Support of Appellant at 11, *United States v. Bess*, No. 19-0086/ (C.A.A.F. June 28, 2019) (emphasis added) [hereinafter Brief of Amicus NAACP]. Only eighteen general courts-martial went to trial over that same period. *Id.* (citing U.S. Navy Judge Advocate Gen.'s Corps, *Results of Trial*, https://www.jag.navy.mil/news/ROT_2016.htm (last visited June 14, 2019); U.S. Navy Judge Advocate Gen.'s Corps, *Results of Trial*, https://www.jag.navy.mil/news/ROT_2017.htm (last visited June 14, 2019)).

**3** Trial defense counsel explained to the military judge what he meant by a "preventative *Batson* challenge":

If you don't put any African-Americans on the panel from the get-go, then you can't get a *Batson* challenge because nobody is getting eliminated based on their race. It is almost as though [the] command is preventing [African Americans] from representation on the panel so that [the prosecution] can avoid a *Batson* challenge. . . .

. . . .

. . . With respect to the evidence and the burden, with a *Batson* challenge, the burden would be on the attorney challenging that member to show evidence why they are challenging that member but for the[ir] race, so we would argue that, by avoiding a *Batson* challenge, by not putting . . . African-Americans on the panel, the same burden should apply to the people [i.e., the convening authority and those acting on behalf of the convening authority] that didn't put any African-Americans on the panel.

- In furtherance of his motion, trial defense counsel specifically asked the military judge to give him the opportunity to discover the "statistical breakdown of the population as far as race with respect to the convening authority's command." The military judge denied the defense motion.

- Appellant was subsequently convicted by the panel members and sentenced to prison.

Based on these facts, would "an objective, disinterested observer . . . harbor a significant doubt about the fairness of the proceedings"? *Boyce*, 76 M.J. at 248. In light of the current state of the record, the answer is an unequivocal and emphatic, "Yes."

Because of the grave and broad implications of this matter, however, it is important that this Court not prematurely reach any conclusions—or cast any aspersions—regarding precisely what happened in this, and similarly situated, cases. Simply stated, we need more information. Accordingly, at this juncture I merely seek to remand this case for a *DuBay* hearing so that additional facts can be developed and included in the record.[4] *DuBay*, 17 C.M.A. at 147, 37 C.M.R. at 411.

Indeed, that is exactly what occurred in the recent case of *United States v. Riesbeck*, 77 M.J. 154 (C.A.A.F. 2018), which also involved the issue of unlawful command influence resulting from a convening authority's selection of court-martial members. Specifically, in that case there were allegations of "court stacking" because of the disproportionately large number of females selected to serve on the court-martial panel of a servicemember charged with rape, and the court below "ordered a post-trial hearing in accordance with *DuBay* . . . to receive testimony and evidence regarding the composition of Appellant's court-martial panel." *Id.* at 159–60, 163. Surely a *DuBay* hearing is similarly reasonable, appropriate, and prudent in the instant

---

[4] Ordering a factfinding "*DuBay* hearing" is an often-used practice in the military when information relevant to deciding an issue before the Court is not "apparent on the face of the record." *United States v. DuBay*, 17 C.M.A. 147, 149, 37 C.M.R. 411, 413 (1967).

case.[5] And yet, the majority inexplicably has chosen to foreclose this basic and necessary avenue of inquiry.

In concluding that no *DuBay* hearing is necessary, the majority assumes—and rests its holding on the conclusion that—"[t]he record shows the convening authority neither knew nor had reason to know the races of nine of the ten members whom he detailed to Appellant's court-martial." But the record reveals no such thing. In actuality, the record is devoid of any information regarding what the convening authority knew about the race of the members he selected or how he selected those members for Appellant's court-martial panel.

## II. The Defense Discovery Motion

The majority's decision to affirm the Navy-Marine Corps Court of Criminal Appeals is particularly surprising because even if we were to remove our analysis of this case from an unlawful command influence context and instead analyze it simply as a mundane discovery motion, a remand for a *DuBay*

---

[5] The types of questions that could be answered in the course of a *DuBay* hearing are self-evident: Were there any African Americans on the panel at Appellant's court-martial? What was the racial composition of the pool of potential panel members from which the convening authority could have selected? Was the convening authority aware of the race of the members he detailed, either through personal knowledge or through documents or other information presented to him? What was the process the convening authority used in selecting members for Appellant's court-martial? Did the convening authority's subordinate commanders or the staff judge advocate (or other staff members) screen potential panel members based on race, thereby effectively excluding African Americans from the convening authority's consideration? How did the convening authority know how to identify minority members to be added to a later court-martial when that African American defendant similarly objected to the original all-white panel? *See United States v. Bess*, __ M.J. __ , __ (4 n.2) (C.A.A.F. 2020). In how many instances did the same convening authority convene an all-white venire panel when the accused was a member of a racial minority, and in how many instances were these members of a racial minority accused of sex-related offenses? If the answers responsive to the questions above are supportive of Appellant's position, can the convening authority identify race-neutral reasons why he appointed all-white panels in several cases where an African American was accused of sex-related offenses?

hearing still would be clearly warranted.[6] This conclusion is supported by the following points.

In essence, trial defense counsel was making an oral discovery motion when he asked the military judge to give him the opportunity to discover the "statistical breakdown of the population as far as race with respect to the convening authority's command." The standard we use in reviewing a military judge's discovery ruling is an abuse of discretion. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004) (citing *United States v. Breeding*, 44 M.J. 345, 349 (C.A.A.F. 1996)). By definition, the military judge in this case abused her discretion because her ruling on the motion was grounded in her misunderstanding of both the law and the facts. *See United States v. Graner*, 69 M.J. 104 (C.A.A.F. 2010).

First, the military judge concluded that Appellant's discovery motion was untimely. Specifically, she stated:

> [W]e've all had the members' questionnaires for a week, *and the race that each member most strongly identifies with is noted on the questionnaires*. If this was an issue that you wanted to raise prior to now, when we are in individual voir dire, that would have been a more appropriate time.

(Emphasis added.) Her reasoning, however, was faulty—both factually and legally. The factual assertion that the race of each member was noted on the questionnaires was inaccurate. For unexplained reasons, only one of the questionnaires listed race. Moreover, as we noted in *Riesbeck*, Rule for Courts-Martial (R.C.M.) 912(b)(3) "provides an *exception* to the requirement that a timely motion be made *where an objection is based on an allegation that the convening authority selected members for reasons other than those listed in Article 25, UCMJ*."[7] 77 M.J. at 160 (emphasis

---

[6] Issue III in this case reads as follows: "Whether the lower court erred in affirming the military judge's denial of Appellant's motion to produce evidence of the racial makeup of potential members." *Bess*, 79 M.J. at 47.

[7] Article 25(e)(2), UCMJ, states in relevant part: "When convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training,

added). Thus, the military judge was wrong when she ruled that Appellant's discovery motion was untimely when he raised it during voir dire.

Second, the military judge erred in basing her ruling on her unsubstantiated belief that obtaining statistical information about Navy personnel would be a difficult "feat," stating that she had "no idea how the command would go about accomplishing" this task. There was no evidence adduced at the court-martial which supported this contention that it would be difficult to obtain the requested information, and in fact, intuitively the opposite is true; the military is very adept at tabulating data about its personnel and that information is readily available.[8] Therefore, the military judge's purported finding of fact was not supported by the record and is an abuse of discretion. *See United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F. 2004).

Third, the military judge erred both factually and legally when she ruled that the information sought by trial defense counsel was irrelevant to his claim that the convening authority had improperly excluded African American servicemembers from the court-martial panel. Specifically, the military judge averred:

> I don't see, frankly, how it is relevant, absent any evidence of impropriety. I have sat on numerous panels and observed members of other panels while here, and I have not seen any indication of any pattern of discrimination by excluding minority members.

To begin with, the military judge herself had previously acknowledged that trial defense counsel's argument would be "slightly stronger" if he "knew more information about the racial and statistical makeup of the pool of members for that particular convening authority." Thus, she conceded that the information was relevant. But then when trial defense counsel requested that type of information in order to support his

---

experience, length of service, and judicial temperament." 10 U.S.C. § 825(e)(2).

[8] *See, e.g.*, U.S. Navy Demographic Data, https://www.navy.mil/strategic/Navy_Demographics_Report.pdf (last visited on May 8, 2020).

argument, the military judge executed an about-face and denied his request.

Further, in ruling on the discovery motion, the military judge claimed she could *not* determine the race of the members of the panel *based on her personal observations*. However, at virtually the same time she claimed that *based on her personal observations* of *other* panels, she *could* determine there was no pattern of discrimination based on the race of the members. To put it charitably, these claims are in tension with one another. Moreover, in making these claims the military judge used her personal observations—rather than in-court evidence—to find the defense discovery request was not relevant. Again, this constituted an abuse of discretion. *See Gore*, 60 M.J. at 185.

It is evident that relevant statistical information regarding the convening authority's command would have been instrumental in supporting—or refuting—Appellant's claim that there had been an improper exclusion of members from the court-martial panel on the basis of race. And yet, the majority asserts that Appellant's claim must fail because the discovery motion at trial "covered only the convening authority's command, which is only a subset of the total eligible pool of members." The majority's concern is misplaced. In *United States v. Datz*, 61 M.J. 37, 42 (C.A.A.F. 2005), this Court properly noted that an oral motion or objection made during a court-martial must be considered in context to determine if the basis for the motion was sufficiently clear to the military judge. Here, it was clear to everyone at the court-martial exactly what the defense was seeking—information that would help to determine whether there was an improper exclusion of members from the venire panel on the basis of race.

In light of the fact that trial defense counsel already had noted that this was the *second* case in which an African American servicemember accused of a sex-related offense was tried by a hand-selected panel that appeared to be all white, the military judge's blanket refusal to let trial defense counsel simply "peer behind the curtain" at how the convening authority had selected these panel members was an abuse of discretion. Thus, contrary to the military judge's ruling, trial defense counsel should have been permitted to obtain such

information. Because the military judge abused her discretion in deciding this matter, the instant case should be remanded for a *DuBay* hearing so that the information may now be obtained.

### III. Appellant's Constitutional Right to Equal Protection Under the Fifth Amendment

Even standing alone, the two issues cited above—i.e., Appellant's unlawful command influence claim and the military judge's abuse of discretion in resolving Appellant's discovery motion—provide compelling and conclusive reasons mandating the remand of this case for a *DuBay* hearing. And that is before I even have had the opportunity to address Issue I, which serves as the very core of Appellant's claim; namely, whether the convening authority's selection of members violated his constitutional right to equal protection under the Fifth Amendment.[9]

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court made the following observation:

> More than a century ago, the Court decided that the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposely excluded. *Strauder v. West Virginia*, 100 U.S. 303 (1880). *That decision laid the foundation for the Court's unceasing efforts to eradicate racial discrimination in the procedures used to select the venire from which individual jurors are drawn.*

*Id.* at 85 (emphasis added).

---

[9] The majority characterizes Appellant's Fifth Amendment claim as one seeking "to have members of [his] own race . . . included on . . . [his] court-martial panel." Although trial defense counsel's initial objection stated, "[O]ur client is African-American, and there's no African-American representation on the panel," he later clarified that the basis for his objection was a "preventative *Batson* challenge." In doing so, trial defense counsel explained, "If you don't put any African-Americans on the panel from the get-go, then you can't get a *Batson* challenge because *nobody is getting eliminated based on their race*." Thus, contrary to the majority's portrayal, Appellant's claim is rooted *not* in a failure to *include* African Americans on the panel, but in the possible *intentional exclusion* of potential members on the basis of race.

Consistent with this line of jurisprudence, the Supreme Court has unequivocally held that "the systematic exclusion of [African Americans in the jury selection process] is . . . an 'unequal application of the law.'" *Castaneda v. Partida*, 430 U.S. 482, 493 (1977) (quoting *Washington v. Davis*, 426 U.S. 229, 241 (1976)). Similarly, the Supreme Court has held that the equal protection component of the Due Process Clause of the Fifth Amendment prohibits the United States from engaging in governmental action that "invidiously discriminat[es] between individuals or groups." *Washington*, 426 U.S. at 239. In *United States v. Santiago-Davila*, this Court made clear that this equal protection component of the Fifth Amendment applies to the military, holding that the "equal-protection right to be tried by a jury from which no 'cognizable racial group' has been excluded" applies to courts-martial panels with the same force as it applies to civilian juries. 26 M.J. 380, 390 (C.M.A. 1988) (quoting *Batson*, 476 U.S. at 96).

Although *Batson* holds that the Equal Protection Clause "forbids *the prosecutor* to challenge potential jurors solely on account of their race," the constitutional scope of that opinion—if not its literal holding—extends beyond the context of peremptory challenges during voir dire. *Batson*, 476 U.S. at 89 (emphasis added). First, in *Batson* the Supreme Court specifically noted that "the Constitution prohibits *all forms* of purposeful racial discrimination in selection of jurors." *Id.* at 88 (emphasis added). Second, as noted earlier, the Supreme Court in *Batson* tellingly referred to the need "to eradicate racial discrimination *in the procedures used to select the venire from which individual jurors are drawn.*" *Id.* at 85 (emphasis added). And third, it simply cannot be the state of the law that the shield of the Fifth Amendment is strong enough to protect an African American defendant from the impermissible exclusion of panel members on the basis of race *during voir dire*, but is impotent in similarly protecting those servicemembers *during the selection of the venire panel in the first instance. Id.* at 86.

The uniqueness of the role of the convening authority in the military justice system underscores the importance of this point. Unlike in the civilian jury system, venire pools in the military are not chosen at random from, for example, voter registration rolls or Department of Motor Vehicles databases.

Rather, a convening authority has significant and broad discretion to detail to the court-martial panel anyone who, "*in his opinion*, [is] best qualified for the duty." Article 25(e)(2), UCMJ. Accordingly, the convening authority "has the *functional equivalent of an unlimited number of peremptory challenges*." *United States v. Carter*, 25 M.J. 471, 478 (C.M.A. 1988) (Cox, J., concurring) (emphasis added). Thus, the fundamental equal protection principles espoused in *Batson* must apply broadly to the *entire* jury-selection process—to specifically include the convening authority's selection of the venire panel—to ensure that the constitutional rights of accused servicemembers are protected.[10]

In the instant case, Appellant properly and timely sought to avail himself of his constitutional rights by challenging the composition of the venire panel during voir dire.[11] And yet,

---

[10] In *Castaneda*, a case relied upon by the *Batson* court, the Supreme Court outlined the process by which an accused could make a prima facie showing of an equal protection violation in the context of grand jury selection. 430 U.S. at 494–95. The second step of the analysis requires an accused to prove the underrepresentation of a cognizable racial group in the pool of those called to serve as grand jurors "over a significant period of time." *Id*. at 494. The majority implies that *Castaneda* requires an accused to produce data covering a lengthy number of years before a court could intervene to halt pernicious racial discrimination. However, the majority fails to explain how their expansive time frame fits within the unique features of the military justice system. Convening authorities serve in their roles for a finite period of time, often for a few years or less. In the instant case, for example, the convening authority served from March 10, 2016, to July 20, 2018, for a total of just twenty-seven months. Brief of Amicus NAACP, *supra* note 2, at 20. Thus, under the majority's view of *Castaneda*, the constitutional right to equal protection would be essentially unenforceable in the military where a convening authority serves in that particular role for less than a lengthy number of years—as happened in Appellant's case.

[11] The majority faults Appellant for failing to ask the convening authority to "includ[e] diverse members [on his court-martial panel] . . . prior to trial." However, Appellant did not raise his Fifth Amendment claim prior to trial because only one of the ten deficient member questionnaires created by the Government listed race, and thus Appellant was not aware of the suspicious nature of his all-white panel until he saw the members for the first time in court during voir dire. As soon as Appellant learned the racial composi-

the military judge thwarted his efforts by improperly denying his discovery motion. This Court must now remedy this error, and can begin doing so by simply remanding this case for an evidentiary hearing so that the facts can be gathered that will either expose and rectify an invidious pattern of racial discrimination in the member-selection process, or reveal Appellant's court-martial to be a mere "anomaly . . . with no evidence whatsoever of intentional discrimination." *Bess*, __ M.J. at __ (15) (C.A.A.F. 2020). Only then can we be assured that Appellant's constitutional rights have been protected.

### IV. Conclusion

When a member of our Armed Forces makes a prima facie showing of a violation of his constitutional right to equal protection under the Fifth Amendment based on the intentional and impermissible exclusion of African Americans from a court-martial panel hand-selected by a convening authority, a remand for an evidentiary hearing is mandated. Indeed, as we recently and unanimously stated, "[I]t is *incumbent upon this Court to scrutinize carefully* any deviations from the protections designed to provide [the] accused servicemember with a properly constituted panel. . . . [*E*]*ven reasonable doubt concerning the use of impermissible selection criteria for members cannot be tolerated.*" *Riesbeck*, 77 M.J. at 163 (emphasis added) (internal quotation marks omitted) (citations omitted).

And yet, despite the clear-cut mandate of *Riesbeck* and despite the compelling and highly disturbing facts in the instant case, the majority has chosen to ignore this precedent, our attendant responsibilities, and the fundamental principles underlying a number of relevant Supreme Court cases by denying Appellant a simple *DuBay* hearing so that he may seek to

---

tion of his panel, he raised his preventative *Batson* objection. Further, to be clear, *an accused has no right to a member panel "composed in whole or in part of persons of* [*his*] *own race." Powers v. Ohio*, 499 U.S. 400, 404 (1991) (emphasis added) (internal quotation marks omitted) (quoting *Strauder*, 100 U.S. at 305). But, an accused such as this Appellant "*does* have the right to be tried by a jury whose members are selected by nondiscriminatory criteria," and it is *this* constitutional right of which Appellant sought to avail himself *at trial*. *Id*. (emphasis added).

vindicate his legal and constitutional rights. This decision by
the majority is wrong—fundamentally and egregiously—and
has grave implications for all future courts-martial involving
African American servicemembers. Therefore, I respectfully
dissent.

Judge SPARKS, with whom Judge Ohlson joins, dissenting.

I agree with Judge Ohlson that the military judge abused her discretion and I join his dissent. The military judge's somewhat cursory treatment of the issues and her desire to move on demonstrated her frustration with the timing of defense counsel's request. Nonetheless, given the significance of the issue, the military judge should have at least ordered a brief recess to allow the parties time to investigate whether a compromise could be reached to resolve the issue. Indeed, there is some indication in this record that the convening authority might have obviated the issue all together. True, it is just as possible that an effort seeking such a compromise might not have been successful, but in my view an attempt would have been worthwhile.

I especially agree with Judge Ohlson that even if *Batson v. Kentucky*, 476 U.S. 79 (1986), itself does not explicitly apply to the convening authority, "the fundamental equal protection principles espoused in *Batson* must apply broadly to the *entire* jury-selection process." *United States v. Bess*, __ M.J. __, __ (11) (C.A.A.F. 2020) (Ohlson, J., with whom Sparks, J., joined, dissenting). That includes subordinate authorities tasked with providing candidates for the convening authority's consideration. I also agree that the state of this record does not allow a proper resolution of Issues I and III. I believe Appellant presented enough evidence of inconsistencies in and questions about the member selection process that this Court should order a post-trial hearing in accordance with *United States v. DuBay*, 17 C.M.A. 147, 37 C.M.R. 411 (1967), to gather further information.

As articulated in *United States v. Campbell*, the bar for ordering further collection of evidence through a *DuBay* hearing is not high:

> A [*DuBay*] hearing need not be ordered if an appellate court can conclude that the motion and the files and records of the case…*conclusively* show that [an appellant] is entitled to no relief …. [A] hearing is unnecessary when the post-trial claim (1) is inadequate on its face, or (2) although facially adequate is conclusively refuted as to the alleged facts by the files and records of the case, *i.e.*, they

state conclusions instead of facts, contradict the record, or are inherently incredible.

57 M.J. 134, 138 (C.A.A.F. 2002) (alterations in original) (internal quotation marks omitted) (quoting *United States v. Ginn*, 47 M.J. 236, 244 (C.A.A.F. 1997)).

Here, Appellant introduced enough uncertainty about racial disparities in the member selection process in his and other cases that his claim was neither inherently incredible nor conclusively refuted. As the record currently stands, we do not know if or why all-white panels may have been assigned to cases involving African American defendants accused of sexual offenses. The letter and signed affidavit from Commander Czaplak, the Executive Officer of the Defense Service Office Southeast, raises questions about a possible pattern of improper selection that this Court should investigate further, especially given the Supreme Court's recent reliance on "historical evidence" to identify patterns in jury selection in *Flowers v. Mississippi*. 139 S. Ct 2228, 2245 (2019).[1] Therefore, I believe a *DuBay* hearing is merited.

This Court has acknowledged that the military justice system's member selection process, though not bound by the strictures of the Sixth Amendment jury trial requirements, merits vigilance and careful scrutiny to ensure that protections afforded a military accused are not violated. *United States v. Riesbeck*, 77 M.J. 154, 162─63 (C.A.A.F. 2018). We have also recognized that the convening authority has "significant discretion" to select panel members as he or she sees fit consistent with Article 25, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 825. *Id.* at 163. Therefore, it is vitally important that our military justice system take seriously any claim that the member selection process in a particular court-martial may have improperly disadvantaged the accused in any way.

In my view, a remand for a *DuBay* hearing would be in the convening authority's interest. From a good order and

---

[1] In *Flowers*, the Supreme Court reiterated a defendant's right to cast a wide net in gathering relevant historical evidence pertaining to the government's discriminatory jury selection process (in the case of *Flowers*, a pattern of preemptive strikes of black jurors in direct violation of *Batson*, 476 U.S. 79. 139 S. Ct. at 2245. To paraphrase that opinion, we cannot take the history out of the case. *Id.* at 2246.

discipline standpoint, the convening authority, like any commander, would want to be informed and to take measures to tamp down any perception, even an erroneous one, that racial animus might have found its way into the court-martial process. Commanders, unlike judges and lawyers, are uniquely positioned to understand how easily perception can transform into fact in the minds of some members of the command.

The current record leaves a number of unanswered questions surrounding the concerns raised by Appellant. The prudent step at this point in the proceedings would be for the Court to authorize a *DuBay* hearing to shed further light on the panel selection process including the actual racial composition of Appellant's panel, the information available to the convening authority and how he or any subordinate commanders might have gone about selecting prospective members for this court-martial, and *relevant* racial statistics of the member pool. We might all agree that trial defense counsel could have done better in presenting and following up on his claim. However, defense counsel's actions notwithstanding, given the serious nature of the issues—and that they potentially impact other African American accuseds under this convening authority—it is this Court's responsibility to gather a complete enough record that we may fully assess whether any impropriety has occurred. Importantly, such an inquiry does not, in and of itself, suggest anything improper.

For these reasons, I respectfully dissent.